The next case on our docket is 514-0571 in the matter of the Estate of John Tate, a disabled adult. Mr. Brudd for the appellant. You may proceed when you're ready. Thank you, Your Honor. For the record, my name is Curtis Brudd, and I represent Sandra White, the appellant. We request that this judgment be pardoned. May it please the Court. My outline for this presentation is to first talk about what this judgment is and isn't. And it's just as important what it is as what it isn't to understand this case. Second, I want to talk about the so-called fiduciary relationship between the decedent, John Tate, and my client, one of his caretakers. And third, I want to talk about the solemn written receipt for property delivered by my client, receipt given by counsel for the estate. There's also an issue of appellate jurisdiction. I consider that issue one for the briefs. Unless I'm prompted to, I won't discuss it here. First, about what the judgment is and isn't. The testimony at this citation proceeding was almost entirely about what was in John Tate's house and what wasn't. And about what happened to those things, where they were and where they went. What was in the house before he died, what was in the house after he died. Things like an iPad, a Kindle Fire, a watch, and jewelry. The estate adversely examined Ms. White, my client, and then three other persons who claimed to have knowledge of the contents of the house. Mr. Blood, were you counsel at that hearing? I was not, Your Honor. And there were some items that Ms. White agreed she had taken. It was pretty obvious that people didn't trust lawyers in this case until the estate hired one. And John Tate should have hired a lawyer. My client should have hired a lawyer. But until the estate got into court, nobody did. But the judge, well, my client admitted that part of his estate plan, if you want to call it that, John Tate, was to take things and keep them safe for his grandchildren so that his children wouldn't get them. She admitted that she took certain items, most notably a collection of quarters. So she admitted that. She also admitted that she received four rather large items, one a storage shed worth over $2,000, another payment for work on the house. She was an electrician, $1,300. Anyway, these items, like I said, pretty much divide into what my client admitted receiving and what my client denied having. Now, what's important about that division is that when you look at the judgment, the trial court accepted my client's denial as to everything she said she didn't have, everything. She said she didn't have the candle, the watch, the jewelry, everything that my client denied having, the judge accepted that denial. So the matters that we're here about today and that we're trying to get this judgment straightened out on concern the things that she admitted having, the four items, the $1,300, the storage shed, there's two others, and then the boxes of things that she took out of the house, as she said on John Tate's instructions, as kind of his estate plan. So the testimony, most of the testimony in this case is not relevant to this appeal because it's about what was in the house, what the estate claim to my client had, what my client denied having, what the judge agreed with her she didn't have. So the questions really are not questions of fact. They're pretty much questions of law, and the weight of the evidence, what the evidence is and isn't doesn't come in so much. So we wouldn't be here if it wasn't for certain legal stakes that the trial court made. And the first one is that the trial court found or held that my client owed a fiduciary duty to the deceiver. The power of attorney, and I've got it right behind the appendix tab so you can see it, is not a power of attorney. And actually, when we pointed that out, the estate didn't argue that it was. This is no more a power of attorney than if you took your Walmart shopping list from the power of attorney at the time. It doesn't authorize my client to do anything in the place of, in the person of John Tate. It's nothing more than a dying man's request that somebody look out for his daughter. That's all it is. Now, on appeal, the estate makes the rather surprising claim that there was some other basis for a confidential relationship between John Tate and my client. I've examined the record, and the first place I see this claim raised is in the blue cover brief in this court. And as I said, the claims that were taken up in front of the trial court, the things that witnesses were asked about, what was in the house, what was missing, were not the sort of questions that you'd ask of people from whom you were trying to establish what sort of relationship my client and the decedent had. They're just the wrong questions. Also, to a great extent, the wrong witnesses. There were two people left out of the three that were in the house to lie. Daryl, the brother of the decedent, who did 12 hours of care a day for the last month or more. Carla, her daughter, who was there 24-7 from home. They were not examined at all. The one that was there, Pat Brodden, who was another, who was the sister of the decedent. She wasn't asked anything like that kind of questions. The only one who was questioned about the relationship between my client and the decedent was a visiting nurse who was there several times who said it was an appropriate relationship. As I understand it, this hearing was merely on a motion or a citation to discover assets. And recover. And recover. Okay, so in the motion to, or in the citation to recover, was there fraud alleged? I mean, I don't have that motion. Fraud was never alleged until page, or never mentioned until the trial court mentioned it, page 62 of the transcript. Okay, but the pleading itself, that was before the court. The pleading. No fraud. No fraud. There was a will that had been filed. Consent. But a will nevertheless, right? Right. So the actual pleading that was before the court was simply a citation to discover and recover assets. Correct. There's still a lot more to do in this estate. Correct. And still pending. Correct. Okay. I'm just wondering where the whole fraud and, I mean, when you say citation to discover and recover, because the pleading's not attached that I can see, I'm wondering how all of this other extraneous issue arose. Was it objected to at the trial? No, Your Honor. Okay. And like I said, it was raised by the court. But the, this was, I imagine discovery could have been done, but this was very much a shoot from the hip area. This, I don't see any discovery here at all. And the parties, like I say, no one mentioned fraud until the trial judge became aware of the so-called power of attorney. And apparently, I mean, he must have just looked at the heading power of attorney, realized that it named my client, and gone. That's a principal-agent relationship as a matter of law and, therefore, a fiduciary relationship. And, therefore, there's a presumption that any transaction between the two of them, principal and agent, was fraud. Rebuttal presumption. In other words, he didn't have to find fraud. Fraud was presumed under the Spring Valley case. And he put it to my client to rebut the presumption of fraud. Counsel, let me ask you. You're saying you believe that the court's analysis as far as there being a fiduciary relationship is solely based on the power of attorney? Absolutely, Your Honor. Okay. Well, in his first finding in his written order, it says the court further finds that your client was a fiduciary for the decedent, pursuant to their confidential relationship and a power of attorney executed by the decedent on January 25th, 2014. So his written order says, as I read it, that he was looking at the facts of all the facts that were presented as far as what your client was doing for the decedent and this document, and those together create this fiduciary relationship. But that's how it reads, Your Honor. And if you only had ten seconds to understand the case, that would jump right out and that would be the end of it. But what else comes out is, first, that it isn't a confidential relationship when one is principal and the other is the agent. So the power of attorney itself was a confidential relationship. So that sentence is hopelessly redundant. But, in other words, it's a confidential relationship by virtue of the power of attorney. So that sentence doesn't make any sense. It's not and. It's already a confidential relationship if you assume that there's a power of attorney. And the second part is, of course, that no questions were asked that would support that. That was not what the witnesses were asked about. That's not what they testified about. And that the one witness who would know anything about the relationship, the personal relationship, between the decedent and my client wasn't asked those questions. She was asked where was the Kindle or where was the computer or where was the watch, where was the jewelry. Was it not at this hearing that all the evidence came in from your client as to what she was doing for the decedent, what she had been asked to do to hold certain money, to do things with these pieces of personal property? So I took the court as looking at all that evidence that came in basically from your client and saying, well, because of these actions and the trust put in your client by the decedent, there was this confidential relationship that was created. But, Your Honor, I think the more quickly you look at the judgment, the more that seems to be the case. But as you read what the evidence was and you see the judge's comments during the hearing, I mean, he seized on that power of attorney. He didn't mention anything else. And as I pointed out, the sentence that we're talking about in this judgment is hopelessly redundant. It's a confidential relationship. That's what a power of attorney means. Mr. Blood, do you agree that aside from the power of attorney, the confidential relationship can be an independent basis for a fiduciary relationship? Yes, Your Honor. And that's what the Kolachek case that's cited by the estate sets forth those factors. I believe they deal with degree of kinship and disparity in age, health, and mental condition. Weren't those factors present, some of them here, such as this man was dying and she was holding herself out to be his daughter even though she wasn't? Well, those – I wouldn't agree with the second one, but there was disputed evidence on that. Well, comment on that, because I believe that was in the judge's order, wasn't it? I'm not recalling where I saw it, but there was comment by the judge that this was a factor, this issue that she was calling herself Tate. Honestly, Your Honor, I don't remember which way the judge came out on that, but when I get back up here, I will. That had to do with the building, didn't it? With the shed, yes. Yeah, didn't that have to do with the building? Yes, and the testimony of my client, which was unrebutted, was that the man put down Sandra Tate and he said – And wouldn't change it. Yeah, and he refused, and that was unrebutted. So this confidential relationship, you agree that it can create a fiduciary duty in and of itself, but whose burden is it to show the confidential relationship? The party claiming that it exists by clear and convincing evidence. And again, the pleading before the court, did that mention anything about this? No, Your Honor, it did not. The first time that this was mentioned other than the power of attorney was in the blue cover brief in this court. Okay, so when we go to the record and we look at this pleading that is the issue before the court, we're not going to see that. That's right. Okay. Black and white, and look up in the book. I can understand that this court might want to go off on that, but an issue like this that didn't come up in the circuit court, that we didn't have a chance to fairly rebut it. There's of course a principle that the judgment should be affirmed on any basis supported by the record. But that's a general rule, and the necessary exception to that is it's got to be an issue that was litigated. If it's an issue of fact, both sides have to have a shot at it. You can't just go in your appellee's brief, cherry pick facts and say, see, it could be supported on that. It's not a litigated issue. And basically this court's being asked to retry it, to try it on a different issue. We didn't have a fair shot at it. But all of a sudden, boom, sprung up on ambiguous language in the trial court's order. So of course the importance of the fiduciary relationship is that these four major transactions, if there are not, if there's no presumption of fraud there, fraud certainly wasn't anything close to proved. And then it becomes the estate's burden to prove that there's some other reason why it can assert ownership over this stuff. And even if it's a fiduciary relationship situation, which it isn't, my client put in an awful lot of time and work in this case. And frankly, John Tate was very fortunate to have her. She's a very nice person, a very capable person. And when my time comes, I hope that I have someone that nice to take care of me. Question about that, Mr. Bloodkin. She's not prohibited by this citation from filing a claim for those claims. That's correct, Your Honor, and her claim is in the record and it has been objected to. But I think that's the point I'm trying to get to is what Justice Moore was just commenting on. This pleading was only to recover certain items to get them back into the estate. There's no disposition of the items. There's no decision on the will contest. I mean, for all we know, the will could go her way and she could get some of these items back. Is that true or not true? That is true. What you have said is correct, Your Honor. As far as the will goes, that's in the record, too, and it's not – she's not – she does not take – she's not a beneficiary. No, but she's – I thought she was going to have some – maybe that was the property attorney. Okay. You may go ahead. I don't want to take your time. But, Mr. Blood, she has filed a claim on all these services that you are talking about. She has, Your Honor. And that's not yet been heard by the probate court. That's correct. It's not in the record, but it's also, as I understand it, correct. But this matter is more or less – I'm talking off the record here, but I think it's more or less in limbo while we're here. Well, like I said, if there's no fiduciary relationship, there is also no proof of ownership by the estate. My client's testimony that this – the fiducy basically gave her this stuff is not only reasonable testimony, but it's only budget. And the estate, on these four major items, did not make this case. So if they don't have a fiduciary relationship, they've got no case on that stuff. And the only other stuff we'll hear about is the estate, Your Honor. Unfortunately, we'll have to hear from you, Your Honor. Thank you. Okay.  Yes. Ms. Nolan? Megan Nolan, representing the estate. Okay. You may proceed. May I please report? My name is Megan Nolan. I represent the estate, and Quinn Tate is the administrator of this estate in this case. Just a couple of quick notes for the court. This estate was filed as an intestate estate. The will that was filed with the circuit clerk's office, which was filed two days after the recorded execution of the will, was witnessed by one witness only. It was signed by John Tate and witnessed by a notary and was filed with the clerk's office in that form. As you all are aware, we're subject to the probate statute. In order to be validly executed, a will must be witnessed by two non-interested parties. And therefore, we felt that there was not a validly executed will in this case, and we filed an intestate estate. Was there ever a petition for admission of that will filed? There was not. So no one's petitioned the court for admission of the will? There was not. And it was filed before the decedent's death, two days after it was purportedly signed by the decedent? Correct. It was filed approximately— Or Mr. Tate, who was then alive, I guess I should say. Correct. It was filed approximately a month before his death. And Ms. White presented it to the court during the guardianship proceedings, but not actually during the estate proceedings in this case. So my take on this case, obviously I represent the estate, but this is a case where we've got a woman who has come in, befriended a man who is terminally ill with cancer and is doing her best to take advantage of her. Mr. Tate died on February 28th of 2014. He was a widower. He had three children. Sean, who lives in New York. Quinn, who is in the Army and lives currently in Georgia. And then Kalon, who was residing with Mr. Tate and he was her caregiver. She is disabled. She is subject—she is a ward under a guardianship proceeding. And currently, Quinn, who is also the administrator of this estate, has been appointed as her guardian of the person and her estate. During the hearing on June 17th, 2014, it was a full-day hearing. We were at the courthouse all day long. Ms. White testified that she was the primary caregiver for Mr. Tate. She testified that she coordinated his round-the-clock care between his sister, his brother, and herself. That she provided at least eight hours per day of care for him herself. That she cared for his daughter while he was unable to. That she would take his daughter to places that she needed to go. She would take Kalon and go grocery shopping for the home. Go get the items that Mr. Tate needed. Do you dispute that? Did the estate dispute that? We don't dispute that she was doing those items. Because one of the curious things in the record is what you just mentioned. The brother and, I think, sister? Yes. They were actually involved with her. They saw her. They knew what she was doing. They had no objection. You are correct. So if you think someone is committing fraud on your father, why do you facilitate it? Why do you allow it to continue? I believe Ms. Brodin actually testified that they were all convinced that Ms. White was trying to do right by John. Once he actually passed away, it brightened up as to the circumstances of what was happening. Ms. Brodin testified herself that yes, Ms. White was there and was helping to care for him. And that she was helping with the round-the-clock care. The court found, as the court has pointed out, in the first paragraph of the findings of the court, the order specifically states that the court finds that John Tate was terminally ill with cancer and that Sandra White was the primary caregiver for the deceased during the end of his life. And then further finds that she was a fiduciary pursuant to their confidential relationship and the power of attorney. I can't say that I necessarily disagree with the appellant's argument that the power of attorney in this case is no more than a wish for someone to help him care for his daughter. However, throughout the course of this hearing, we did present ample evidence to the trial court. Ample evidence to Judge Baffitt to find that there was a primary caregiver relationship here which then brings forth the confidential relationship and fiduciary duty. Obviously, not binding for our case today, but since this case has arisen, a new statute has been put into place that specifically voids transfers to primary caregivers. Whether or not they have power of attorney, whether or not they're family members. And I would ask that the court find that that's at least persuasive as far as the state of our law and that it codifies the state of the case law in this case. We the estate filed a petition for a citation to discover and recover property from Ms. White. Sorry, Ms. White. And listed a number of items that we felt that she had possession of in addition to any other items that she may have removed from the home. May I ask you a question about the coins? There was a receipt filed for the coins. There was. And explain how the estate can give a receipt for something that it now claims it does not have. There was testimony at the hearing, Your Honor. I'm Megan Nolan. I signed that receipt. I will come right out and say it. I've not at all tried to hide that fact from the court. I stipulated to that during the trial court's proceeding that it was my signature on that page. Ms. White was ordered. Back up just a touch. We had a, we had the citation separate hearing at one other time prior to the actual June 17th hearing date. On that date, we entered into an order, Ms. White's attorney and myself, as an agreed order. It was an agreed order. It is within the record. That we were continuing the citation hearing that we were going to be getting. We would be providing them with a list of items that we felt that Ms. White had. And that she would be returning those items to my office. We did so. Ms. White came to my office and she admitted during the June 17th hearing that she was at my office for somewhere between three and five minutes. She brought in three boxes of items. And gave me a three page detailed list and asked me to sign it as a receipt that she dropped these items off. At no point during that exchange, and she admitted on the record during June 17th, at no point during that exchange did I have the opportunity or the time to sit down with those items in that box. And go through line by line for a receipt to say whether or not those items were in there. Additionally, we're not disputing that the quarter collection was returned. What we were seeking during the citation hearing on June 17th was the gold coin and the silver coin collection. Was that part of the receipt? I would admit that there were, there was a bag of quarters dropped off at my office that was probably this big. I know that's hard for the record, but it was a good sized bag of quarters. You're estimating about eight inches? Yeah, about eight inches. And I don't understand, are you saying she pressured you in some way that prevented you as the lawyer controlling this litigation for the estate? That you couldn't sit down and do this? She delivered these three boxes of items and they were heaping boxes of items to my office. And as I took the items and put them over onto my filing cabinet. And she then went back out to her car, came back into my office and handed me the list and said, here I need you to sign this. I looked through it quickly without having the opportunity to go through item by item in the boxes. Am I going to tell the court that that was probably my mistake? I will, I will tell the court that that was probably my mistake. But I think the court... And then you signed the receipt. And I signed the receipt. And the property that she listed, is that all the property she had been ordered to bring? The property that was listed, the previous order was that we would exchange lists and that she would provide whatever she had to our office. We felt at that time that there were still many items that she did not bring to my office. Which is why we proceeded with the hearing on June 17th and set up a hearing. But up to the time you signed the release, she was bringing items voluntarily into your office. And it was really you who had the obligation to... Look through it. Verify it. So why do you want us to ignore the receipt now? I'm not asking that the court ignore the receipt. Why? I'm asking that the court follow the finding by Judge Fabka that was... That we would not have come into court seeking items to be returned to the estate had they been returned to us. Did you present evidence that they weren't actually there even though you actually signed the receipt? Connie, if I could follow up on that. Did you testify at this June 17th hearing under oath? I don't think I was ever actually sworn in. But during her testimony, she did present to the court the receipt that I signed. And I did... I am on the record that I did stipulate that it was my signature and that I had signed that receipt. I don't think I was ever actually sworn in. But as an officer of the court, I would... That would be a problem for you if you did testify and continue to represent the estate. I believe that it would. I'm sorry, did you bang the gap? No. Oh, sure. Okay, go ahead. You may proceed. Thank you. We would ask that the court... And I would different, or I would argue that Mr. Blood's take on this case is a bit different than mine. I believe that this is a very fact-oriented case. That the question of whether or not a fiduciary relationship existed between Ms. White and Mr. Tate is a question of fact. That the question of whether the estate approved certain items were to be returned was a question of fact. And whether Ms. White overcame the presumption that a fiduciary... Any items retained by a fiduciary is a fraudulent transfer is also a question of fact. Did your pleading... And I asked Mr. Blood this. Did your pleading that you filed on behalf of the estate actually talk about fraudulent transfers? It did not. It was a... It did not. It was a simple petition for a citation to recover property and discover information. It was filed on March 12, 2014. And it should be within the court file. So, what was the name of the petition? How was it titled? Petition for a citation to recover property and discover information. And that's pursuant to the Probate Act. And it was filed pursuant to the Probate Act. Correct. And there was no mention of any kind of confidential relationship or fraudulent transfers, and yet the court went beyond the pleading, it seems, and there was a lot of... Now you're arguing confidential and fraudulent transfer. Correct. We, throughout the citation hearings, throughout the citation hearing on June 17th, and we presented ample evidence that there was a confidential relationship and ample evidence that there was a fiduciary relationship. When we finished with the hearing, when we finished with the testimony, the courthouse was closing. Judge Baca essentially requested that we attorneys waive our arguments and that we present to him proposed orders in the case in form of our written argument. And that's how we finished the day. I think we were the last ones out of the courthouse that afternoon. So let me ask you this. The order that we're looking at dated August 21, 2014. Is that the order you all submitted? It is not. It is somewhat similar, but it is not the Tanaki murder probate order. There are portions of it that I believe that he did utilize. We submitted our proposed order. I know that Ms. White's attorney also submitted her proposed order. I did receive a copy of that. Those, I think, were presented directly to court, or presented directly to Judge Baca. I don't know if we're now part of the court file as far as I know. Mr. Blunt was arguing that the paragraph that talks about confidential relationship and a power of attorney is just a mere redundancy. And I was wondering if that was court's language or something that was submitted by one of the parties. Do you know if that paragraph was urbanum as you submitted it? Or did Mr. Blunt submit it? As I stand here, I cannot tell you whether or not it's urbanum. I will tell you that the order that I presented to the court did have language in it that there was a fiduciary relationship, that there was a confidential relationship, and that she was the primary caregiver. Whether or not this is the urbanum paragraph, I can't. So the proposed order should be in the record. Like I said, I'm not entirely sure if that makes it into the court file or if that's sealed or if that was just with the judge herself. If the court would like to see my proposed order, I'd be happy to present that to you. I don't think I can do that right now. I've got that on the computer back in my office. But I will tell you that the order that was entered on August 21st of 2014 was not verbatim the order that I presented to the court. There were portions that I believe were left out of my order. There were portions put into this that were not part of mine. And pieces I believe were also from Ms. White's attorney, Billy Johnson, from her order as well. Within Mr. Blood's reply brief, I just wanted to briefly touch on a couple of topics. He indicates within his reply brief, under paragraph 3, that testimony in the White used the debit and credit cards only for the house and to see the stars, uncontradicted, and that we, as the estate, did not reply to that within our brief. I would argue that I did, in fact, reply to that section within my brief. It was not a separate numbered paragraph. However, within the second portion of my argument within my brief, I believe that I touched on all of the transfers that the court felt were to be returned to the estate in order that Ms. White returned to the estate, including the purchases made on the credit cards and debit cards after Mr. Tate's death. When did the family, after John came home from the hospital, when did the family first object or have any problem with Ms. White? I mean, we have had his family members very involved in his care, and she's a part of it. When did they start complaining? For what? Was it the $20,000? To my knowledge, Ms. Brodin and her brother, Mr. Darrell Tate, Ms. Brodin testified during the June 17th hearing that she felt that the world had been pulled over their eyes and that they were as much a victim to Ms. White's demeanor and niceties as John had been, and that when he passed away, Ms. White had the disabled daughter in her care 24 hours a day, would not allow her to see other people, would not allow her to speak to other people within the family. She changed the locks on the house, wouldn't let anyone aside from herself and her wand enter the house. What happened after the death? That was immediately following his death. And she claimed it was at John's request that the brothers not get anything done. She did claim that. What evidence did you offer the contrary? We presented evidence by way of the testimony of Mara Tate, who was the wife of the administrator in this case. It's also part of the record that my client, who was the administrator of Estate Quinn, being a member of the U.S. Army, had spent quite a bit of time trying to deal with the estate immediately following his father's death and was not permitted leave to come for the hearing. That hearing had also been continued at least once or twice, and so the scheduling of it did not allow for him to attend. But his wife attended, and she testified that she'd been in the house, that she knew what was there, and that they had a close relationship with John. So that would be my answer to that question, Your Honor. Okay. Thank you very much for your argument. Mr. Bug, do you have your battle? Thank you, Your Honor. A lot of questions, a lot of good questions, and it's going to kind of be hodgepodge, but I'm going to try to hit the ones I understood. On this record, not a squeak from the family against Ms. White until John was dead. The record implies that she was the last one seen alive. They were all too glad to have Sandra White's help. As long as she was alive, they just don't like the fact that she ended up with something and it pretty much so far beaten her out of it. The proposed orders are not in the record. Have seen them. I have not seen them. I guess you won't see them. Did the court find that my client held herself out as Mr. Tate's daughter? I don't see that. I'm going to represent right now that while I was listening and reading, I didn't see it, and certainly not mention the connection with the shed part of the order. And if I'm wrong about that, I'm going to fire off a letter of apology as soon as I get back to the office and study it further. The gold and silver coins, yes, they're part of the receipt. In fact, the only bold line in the receipt is the gold quarters in the box. Was there evidence that they weren't delivered? Well, Mary Tate, they call her Mary in the transcript, but she said that she went through the boxes and she said that various stuff wasn't there, but we don't know when she went through those boxes. We don't know where the boxes were before she went through them. She certainly wasn't there when counsel signed the receipt. The receipt kind of settled the case, didn't it? At least that part of it. That part of it settled the case. And if counsel wanted to give my client the bones rush, at that point, at least she had the obligation, if not legal, at least decency, to go through that stuff while it was still all in one piece and see what was in it and make sure that what she signed for was legitimately not bushwhack, not San Diego White, a couple of months late to trial. That's just not right. And I did not realize until I read the cases just the significance that our Supreme Court places on a solemn written receipt. My goodness. It's not just another piece of paper. Not in this state. The Supreme Court has practically worshiped solemn written receipts in this state. It completely took me by surprise. And I put some of that in appellate's brief just to show, just to show my goodness. In this state, receipts are receipts. I think that's all the questions I can remember. A couple of them I didn't hear. If there's any others, I'd be glad to take a shot. Just have one. The $20,000 check that she used to transfer money out. Yes. Was that, was there any evidence that that was a forgery or not signed by the decedent in this case, Mr. Tate? None whatsoever, Your Honor. And she hadn't spent any of it. She moved it. It was to be used for the daughter. But then when the hearing came up months later, not a dime had been spent. Am I right on that? That's correct. Actually, by then it had already, the probate court, when it became aware of the matter, closed the account. But, by the way, it was in the same bank. It didn't even change buildings. Just a matter of digits. But, yeah, every cent. Every cent was undisturbed. She had testified that that's what John Tate wanted her to do. And the way she treated it was consistent with what she testified. Was that all the money that was in the account or did she only take a portion? Do you know? I'll bet the record says that, Your Honor, but I'd be lying if I said I knew. You bet the record says it was all of it? Give me all of it. $20,000 literally emptied the account? Oh, did I empty his account? Oh, I don't know. But I'll bet that is in the record because there is a bank statement in the record. I'll bet that's in there. Okay. Thank you very much. Thank you, Your Honor. Can we ask for, like I say, a partial reversal? Okay. That will conclude this matter, and the court will be in recess. The order will be forthcoming.